IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

QUANTA SIMS,                          :
                                      :
        Plaintiff,                    :
                                      :        No. 5:12-cv-496 (CAR)
        v.                            :
                                      :
QUALITY TRANS, INC.,                  :
                                      :
        Defendant.                    :
_____       :

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Quanta Sims brings this employment discrimination action contending her former employer, Defendant Quality Trans, Inc., discharged her based on her race and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").   Before the Court is Defendant's Motion for Summary Judgment [Doc. 19].   After fully considering the matter, the Court finds genuine issues of material fact exist as to whether Defendant terminated Plaintiff in violation of Title VII, and therefore Defendant's Motion for Summary Judgment [Doc. 19] is **DENIED**.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

1

be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[3] *See id.* at 249-52.
[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

material fact.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

Plaintiff, an African-American female, began working for Defendant on March 27, 2011, as a driver to transport clients to and from non-emergency medical appointments throughout the area of southwest Georgia.  Defendant operates a fleet of vans and contracts with regional transportation brokers that, in turn, contract with state and local governments charged with providing government-funded transportation services for low-income individuals.  From 2009 to 2012, Defendant operated vans throughout the southwest region of Georgia under a contract with Southwest Georgia Regional Development Center, the regional transportation broker responsible for selecting companies to serve the non-emergency transportation needs of patients in the southwest region ("the broker").  Mary Richards, Defendant's general manager, hired Plaintiff and was Plaintiff's direct supervisor during Plaintiff's employment with Defendant.

When Plaintiff began her employment, Defendant provided her with an employee manual that outlined Defendant's policies and procedures, including the

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

procedure an employee should follow when involved in an accident or incident involving a client.  The manual requires all drivers to report incidents as they occur. "Employees that are involved in an accident or incident should follow the following procedures: Call your Supervisor and/or Manager. Stay on scene until manager or supervisor arrives or until you are instructed otherwise by management.  Fill out an[] accident/incident report."[8]  The employee manual defines an "incident" as including, but not limited to, "[m]isbehavior of a client, indecent exposure, fo[u]l language, causing harm to or disrupting other clients, unfastening seat belts."[9]  Plaintiff also understood an incident occurred when a passenger fell out of a wheelchair during transport.[10]

Many of Defendant's clients are wheelchair-bound, and Defendant's vans are equipped to carry wheelchairs.  Immediately upon being hired, Plaintiff received training from another employee, Teresa Adams, in how to properly secure wheelchairs to the floor of the vans and in how to properly secure clients in their wheelchairs while in transit to medical appointments.

---

[8] Quality Trans Employee Manual, p. 71, Pl. Dep., Ex. 1 [Doc. 19-4].
[9] *Id*. at p. 72.
[10] Pl. Dep., p. 21 [Doc. 19-4].

Soon after Plaintiff began driving for Defendant, a passenger in Plaintiff's van reported that his wheelchair was "moving a little."[11]  Plaintiff pulled the van over to check the wheelchair straps.   Because Plaintiff had just started her employment, Plaintiff called her co-worker and the employee who trained her, Ms. Adams, to verify the wheelchair straps were secure.[12]  Once she verified the passenger and his wheelchair were secure in the van, Plaintiff continued to her destination.   The passenger had not fallen from the wheelchair and was not otherwise injured.   Defendant claims this was Plaintiff's "first incident."   Plaintiff, however, maintains this event was not an "incident" at all.   She did not speak to her supervisor about the event.   Defendant neither required her to stay on the scene nor required her to fill out an incident report form.   Defendant took no corrective action against Plaintiff.   Indeed, Defendant neither informed Plaintiff that she failed to follow proper safety procedures nor advised her that if she failed to follow proper safety procedures a second time she would be subject to termination.[13]

On June 21, 2011, Plaintiff picked up William Phelps, a wheelchair-bound passenger, from a nursing home to take him for dialysis treatment at the Da Vita Dialysis Center ("Da Vita").   While transporting Mr. Phelps, Plaintiff noticed that at

---

[11] *Id.* at p. 27.
[12] *Id.* at p. 26, 28.
[13] Pl. Aff., ¶7 [Doc. 21-1].

least one of the straps securing Mr. Phelps's wheelchair to the van "had come loose, causing the chair to tilt over and Mr. Phelps to scrape his arm on the [wheelchair] lift."[14] Plaintiff maintains Mr. Phelps did not fall out of his chair.[15]  She pulled over, got out of the van, checked the wheelchair straps, and tightened the straps.[16]  When Plaintiff arrived at Da Vita and began unloading Mr. Phelps, she noticed "a little blood" on his arm.[17]  Mr. Phelps had a skin disorder where "you could just touch it and it would tear."[18]  Plaintiff went in the clinic to get some tissue and informed an employee that Mr. Phelps "was bleeding a little" and needed to be cleaned up.[19]  The Da Vita employee acknowledged Mr. Phelps's skin condition, indicated he was okay, and "took over."[20]

After the Da Vita employee "took over," Plaintiff immediately called her supervisor, Mary Richards, to report the incident.  She called Ms. Richards several times, both on the radio inside the van and on her cell phone, but Plaintiff was initially unsuccessful in reaching her.[21]  Being unable to reach Ms. Richards, Plaintiff contacted her co-worker, Teresa Adams, to determine how to reach Ms. Richards; Plaintiff also

---

[14] *Id.* at ¶9.
[15] *Id.*
[16] Pl. Dep., p. 36. [Doc. 19-4].
[17] *Id.* at p. 49; Accident/Incident Report, Ex. 2.
[18] Pl. Dep., p. 49.
[19] *Id.* at p. 60.
[20] *Id.* at pp. 60-61.
[21] *Id.* at pp. 61-62; 65-66; Pl. Aff. ¶ ¶ 9-10.

informed Ms. Adams of the incident.[22]  Plaintiff acknowledged to Ms. Adams that she needed to complete an incident report, but she had no forms in her van.[23]  Thereafter, Plaintiff "finally got in contact with Ms. Richards."[24]  When Plaintiff talked to Ms. Richards, Ms. Richards had already heard about the incident.[25]  Ms. Richards claims she learned of the incident from a Da Vita employee, not from Plaintiff; Plaintiff maintains she told Ms. Richards she had been trying to reach her and informed her of the incident.[26]  Regardless, Ms. Richards told Plaintiff to wait at the Da Vita clinic for her brother Robert Richards, also employed by Defendant, to bring her an incident report form.  Plaintiff waited for Mr. Richards and completed the report form when he arrived at Da Vita.  Thereafter, she gave the report to Mr. Richards, who faxed the report to Defendant for its files.

Meanwhile, Stephanie Wynn, a social worker employed at Da Vita in June 2011, saw Mr. Phelps in the lobby of the clinic.  Mr. Phelps asked for assistance because "[h]e was almost out of his [wheel]chair and wanted help with . . . getting readjusted in the chair."[27]  Ms. Wynn went out to see Mr. Phelps and observed that "[t]here was some

---

[22] Pl. Dep., at pp. 65-66.
[23] *Id.* at pp. 67-68.
[24] *Id.* at p. 68.
[25] *Id.* at p. 70.
[26] Pl. Aff. ¶ 21.
[27] Wynn Depo., pp. 16-17 [Doc. 19-6].

blood on his arm, but the wheel on wheelchair was off track."[28]   Wynn stated there was "not much" blood.[29]   Two nurses from the clinic came to check on Mr. Phelps and put a clean dressing on his arm.[30]   Mr. Phelps stated that he hit his head on the wall of the van.[31]   Thus, Ms. Wynn called 911 "for the patient's benefit because if the patient had had any kind of injury – and had any bleeding that we could not see – if we administered Heparin and caused that bleeding to increase – there might be a problem."[32]   After the EMTs arrived, they removed Mr. Phelps's hat exposing an abrasion on his head.[33]   However, the EMTs "assessed [Mr. Phelps], and he wasn't in any distress, and he did not want to go to the hospital."[34]   Mr. Phelps's vital signs were normal.

At some point, Ms. Wynn telephoned a complaint to Defendant's broker "because the tire [on Mr. Phelps's wheelchair] was off its track [] and the patient was injured."[35]   Ms. Wynn also spoke with Mr. Richards and informed him "[t]hat the patient was brought into the unit in this condition, and the chair was in this condition

---

[28] *Id.* at p. 19.
[29] *Id.*
[30] *Id.* at p. 21.
[31] *Id.* at pp. 20-21.
[32] *Id.*  at p. 45.
[33] *Id.* at p. 42.
[34] *Id.* at p. 22.
[35] *Id.* at p. 24.

where it was off track."[36]  Ms. Wynn testified she was not "upset" about the incident but "was very concerned that this patient could be injured and was brought in injured and we are not an emergency room."[37]

The next day, Ms. Richards terminated Plaintiff from employment with Defendant.   Ms. Richards had reported the incident to Daniel Floyd, Defendant's president and chief executive officer, and together they decided not to retain Plaintiff. Ms. Richards told Plaintiff she was discharged because Mr. Phelps had fallen out of his wheelchair and because Plaintiff had failed to report the fall.[38]

Following her termination, Plaintiff sought the assistance of the Sumter County NAACP in filing an application for unemployment compensation with the Georgia Department of Labor and spoke with Reverend Mathis Wright, the president of the NAACP Sumter County chapter.[39]   Plaintiff explained the circumstances leading to her discharge, including her belief she had not violated Defendant's employment policies and had done nothing to justify her discharge.[40]

At the time Plaintiff was employed, Defendant also employed a white male driver named Charles Thomas.  A few months after Plaintiff was terminated, in the fall

---

[36] *Id.* at p. 30.
[37] *Id.*
[38] Pl. Aff. ¶ 12.
[39] *Id.* at ¶ 13.
[40] *Id.*

of 2011, Reverend Wright stopped at a convenience store to get some gas when Mr. Thomas, driving Defendant's van, pulled into the parking lot and asked Mr. Wright to help him get a passenger back into her wheelchair.[41]  Mr. Thomas told Mr. Wright that his passenger had fallen out of her wheelchair inside the van.[42]  Mr. Wright helped get the passenger back into her wheelchair.[43]  The passenger did not appear to be injured.[44] As he was exiting the van, Mr. Wright observed Mr. Thomas pick up the radio in the van and "call[] [the incident] in."[45]  Mr. Wright heard him report that the passenger had fallen out of her wheelchair and was unharmed.[46]  After he reported the incident, Mr. Thomas drove away.[47] Defendant did not discharge or otherwise discipline Mr. Thomas in any manner.

## DISCUSSION

Plaintiff filed this action claiming Defendant terminated her employment because of her race and gender in violation of Title VII.  Title VII makes it unlawful for an employer to discharge any individual, or otherwise discriminate against any

---

[41] Wright Dep., pp. 23-24 [Doc. 19-5].
[42] *Id.* at p. 24.
[43] *Id.*
[44] *Id.* at p. 28.
[45] *Id.* at p. 24; 29-30.
[46] *Id.* at pp. 24-25, 30.
[47] *Id.* at p. 31.

individual with respect to her compensation, terms, conditions, or privileges of employment, because of the individual's race or gender.[48]

Claims of race and gender discrimination based on circumstantial evidence, as in this case, are evaluated under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[49]  First, a plaintiff must establish a prima facie case, or "facts adequate to permit an inference of discrimination."[50]  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.[51]  If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[52]

**Prima Facie Case**

To establish a prima facie case of discriminatory discharge, Plaintiff must produce circumstantial evidence showing that she (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside her protected

---

[48] 42 U.S.C. § 2000e-2(a)(1).

[49] 411 U.S. 792 (1973).

[50] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[51] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[52] *Id.* at 253.

class or was replaced by a person outside of her protected class.[53] "[I]n cases involving alleged racial bias in the application of discipline for violation of work rules," the plaintiff must show "either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."[54]

Defendant concedes, for purposes of summary judgment, that Plaintiff satisfies the first three elements of her prima facie case. The dispute here centers on whether Mr. Charles Thomas is a similarly situated comparator who engaged in similar misconduct but was treated more favorably than Plaintiff.[55]  The Court finds genuine issues of material fact exist as to whether he is a proper comparator, and thus Plaintiff satisfies her prima facie case of discriminatory discharge.

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the Court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different

---

[53] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).
[54] *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).
[55] Plaintiff does not contend she can satisfy her prima facie case by showing she was replaced by someone outside her protected class.

ways."[56]   A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects."[57]   If the comparator is not similarly situated in all relevant respects, "the different application of workplace rules does not constitute illegal discrimination."[58]

In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."[59]   However, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[60]   "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[61]

Here, a genuine issue of material fact exists as to whether Plaintiff is similarly situated in all relevant respects to Mr. Thomas.  Both Plaintiff and Mr. Thomas were employed with Defendant as drivers, they reported to the same manager, and they

---

[56] *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).

[57] *Holyfield*, 115 F.3d at 1562.

[58] *Lanthem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).

[59] *Id.*

[60] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Burke-Fowler*, 447 F.3d at 1323.

[61] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).

were subject to the same employment policies.  Moreover, taking the evidence in the light most favorable to Plaintiff, a reasonable jury could find Mr. Thomas' alleged misconduct was "nearly identical" to Plaintiff's alleged misconduct, yet Plaintiff was terminated and Mr. Thomas was not.  A reasonable jury could find that both Plaintiff and Mr. Thomas failed to properly secure a patient's wheelchair, and, as a result, both of their passengers suffered—Plaintiff's passenger suffered minor injuries, and Mr. Thomas' passenger fell out of her chair.  Both Plaintiff and Mr. Thomas reported their respective incidents, yet Mr. Thomas, a white male, received no punishment while Plaintiff, an African-American female, was terminated.

Defendant argues Mr. Thomas is not a proper comparator because (1) Mr. Thomas voluntarily reported his incident immediately after it happened; Plaintiff did not; (2) Mr. Thomas was never involved in any other incident; Plaintiff was; and (3) Mr. Thomas' passenger suffered no injury; Plaintiff's did.  These attempts to distinguish Mr. Thomas as a proper comparator, however, are distinctions for the factfinder to consider. The evidence supports a finding that Plaintiff reported her incident immediately after it happened, and that Defendant knew of Mr. Thomas' alleged misconduct, as Reverend Wright testified he saw and heard Mr. Thomas report the incident.  Moreover, the evidence supports a finding that Plaintiff, like Mr. Thomas, had never been involved in

a prior "incident" as defined by Defendant's policies.  The fact Plaintiff's passenger may have suffered minor injuries is not enough to distinguish Mr. Thomas as a proper comparator as a matter of law.  Although Mr. Thomas' passenger did not suffer visible injuries, she did fall out of her wheelchair in a moving van.  These distinctions are for the factfinder to consider.  "Exact correlation is neither likely nor necessary, but the cases must be fair congeners."[62]  Plaintiff and Mr. Thomas are "fair congeners."

**Pretext**

Because Plaintiff has established her prima facie case of discrimination, the Court must determine whether Defendant's legitimate, nondiscriminatory reasons for her termination are merely pretext for discrimination.  Defendant identifies four reasons for terminating Plaintiff:

1. Defendant believed that Plaintiff, in violation of Defendant's policy, failed to voluntarily report the incident to her manager;

2. Plaintiff, in violation of her training and Defendant's policy, twice in 12 weeks failed to comply with safety procedures implemented by Defendant to ensure client safety;

3. Defendant believed that Plaintiff was being untruthful in characterizing the incident as minor and concluded that Plaintiff's inattentiveness to proper wheelchair-restraint protocol unreasonably increased Defendant's exposure to liability from personal-injury lawsuits brought by injured clients; and

---

[62] *Silva v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (internal quotation marks and citation omitted).

4.  Defendant concluded that Plaintiffs demonstrated inability to properly secure wheelchairs threatened to jeopardize the contra t under which Defendant provided transportation services to its clients in southwest Georgia—a contract vital to Defendant's financial success.

Because these reasons are ones "that might motivate a reasonable employer,"[63] Defendant has satisfied its "exceedingly light" burden of producing a legitimate, non-discriminatory reason for Plaintiff's termination.[64]

Because Defendant has met its burden, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Defendant's proffered legitimate reasons for termination are merely pretext for race discrimination. "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."[65] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[66]

To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this

---

[63] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

[64] *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769-770 (11th Cir. 2005) (noting that employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).

[65] *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

[66] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

16

either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[67]  Evidence establishing pretext may include the same evidence initially offered to establish the prima facie case of discrimination.[68] Plaintiff has met her burden; genuine issues of material fact exist as to whether each of Defendant's proffered reasons for termination is worthy of credence.

Sufficient evidence exists from which a reasonable jury could find Defendant's first reason for terminating Plaintiff was insincere.  Plaintiff's testimony, together with the incident report she executed and faxed to Defendant, create a genuine issue of material fact as to whether Defendant reasonably believed Plaintiff, in violation of Defendant's policy, failed to voluntarily report the incident to her manager.  Plaintiff testified that after arriving at DaVita and notifying DaVita about "a little blood" on the passenger, Plaintiff immediately called her supervisor, Ms. Richards, to report the incident.  Plaintiff called Ms. Richards several times, both on the radio in the van and on her cell phone, but the line was busy.  Because Plaintiff's initial attempts to reach Ms. Richards were unsuccessful, Plaintiff reported the incident to a co-employee, Teresa Adams—the employee who trained Plaintiff when she first began her employment.

---

[67] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).
[68] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004).

Moreover, Plaintiff did speak with Ms. Richards, who sent her brother to bring Plaintiff an incident report form after Plaintiff informed Ms. Richards she did not have any forms in her van.  The incident report form shows that the time of the incident was 10:50 a.m. and that Mr. Richards faxed the form to Defendant two hours and twenty-four minutes later at 1:14 p.m. Based on these facts, a reasonable jury could certainly find Plaintiff voluntarily reported the incident in accordance with Defendant's policy.

Evidence in the record also casts doubt on Defendant's second reason for termination—that Plaintiff, in violation of her training and Defendant's policy, twice in 12 weeks failed to comply with safety procedures implemented by Defendant to ensure client safety.  First, evidence exists that Plaintiff's so-called "first incident" was not an "incident" under Defendant's policy at all, and a reasonable jury could find that Defendant could not have plausibly believed otherwise.  Plaintiff did not fill out an incident report form nor did Defendant require her to do so.  Defendant neither disciplined Plaintiff nor informed her that she had violated any work rule.  Thus, if the jury finds Defendant did not reasonably believe Plaintiff twice violated its policy, Defendant terminated Plaintiff for the one incident—just like her comparator whom

18

Defendant did not terminate.   A typical means of establishing pretext is through comparator evidence.[69]

 Likewise, enough evidence exists that a jury could distrust Defendant's third proffered reason for terminating Plaintiff—that Defendant believed Plaintiff mischaracterized the incident with her passenger as minor and thus concluded that Plaintiff's inattentiveness to proper wheelchair-restraint protocol unreasonably increased Defendant's exposure to personal-injury lawsuits by injured clients. Plaintiff's characterization that the patient suffered minor injuries is corroborated by Stephanie Wynn, the social worker employed by Da Vita, who testified there was "not much" blood.[70]   Moreover, the factfinder could determine that Ms. Wynn called 911 out of an abundance of caution only to make sure the patient had no internal injuries before the clinic administered any medications that may cause that bleeding to increase.[71] The EMTs assessed the patient and determined he was in no distress, and the patient himself did not want to go to the hospital.[72]   From the evidence viewed in the light most favorable to Plaintiff, a jury could determine Defendant could not have reasonably believed that Plaintiff was being untruthful in characterizing the incident as minor.

---

[69] *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).
[70] Wynn Dep., p. 19.
[71] *Id.* at p. 45.
[72] *Id.*

Finally, Plaintiff's similarly situated comparator evidence undermines the credibility of Defendant's final legitimate, nondiscriminatory reason for Plaintiff's termination—that Defendant had concluded Plaintiff's inability to properly secure wheelchairs threatened to jeopardize their contract to provide transportation services in southwest Georgia—a contract vital to Defendant's financial success.  While the evidence establishes that Plaintiff's incident resulted in a direct report to the broker and thus could have resulted in a more immediate impact, this evidence is for the jury to consider.  No evidence exists Plaintiff's incident jeopardized Defendant's contract with the broker. Indeed, Ms. Wynn testified that she had spoken to the broker before about quality issues.[73] Thus, a jury could reasonably conclude that Defendant should have likewise determined Mr. Thomas, who also failed to properly strap down a client who fell out of her chair, posed a threat to Defendant's contract with the broker to provide transportation services to its clients in southwest Georgia.  Defendant, however, terminated Plaintiff, not Thomas.

Viewed in the light most favorable to Plaintiff, sufficient evidence exists that could lead a rational jury to believe that Defendant was insincere about each of its "legitimate" reasons for terminating Plaintiff.  Because Plaintiff has raised sufficient

---

[73] *Id.* at p. 28.

evidence to establish genuine issues of material fact as to pretext, this Court must deny summary judgment.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. 19] is hereby **DENIED**.

**SO ORDERED,** this 5th day of September, 2014.

<u>S/ C. Ashley Royal</u>
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

SSH